UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JERRY EMERSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:23-cv-01667-TWP-KMB |
| CENTURION HEALTH OF INDIANA, LLC, MERSHON Dr., | ) ) ) ) |
| Defendants. | ) |

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Dr. John Mershon ("Dr. Mershon") and Centurion Health of Indiana, LLC ("Centurion") (collectively, "the Defendants") (Dkt. 36). Also pending is *pro se* Plaintiff Jerry Emerson's ("Mr. Emerson") Motion for Judicial Notice. (Dkt. 42). Mr. Emerson, an inmate at Pendleton Correctional Facility ("Pendleton") filed this action under 42 U.S.C. § 1983, alleging that Dr. Mershon and Centurion have been deliberately indifferent in the treatment of his multiple sclerosis ("MS"). For the reasons explained below, summary judgment is **granted** as to Dr. Mershon and **denied** as to Centurion.

### I. STANDARD OF REVIEW

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S. Ct. 1348 (1986). A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.  FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Emerson and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. Parties

Mr. Emerson has been incarcerated at Pendleton since April 2022. Dr. Mershon, at all relevant times was employed by Centurion as a physician working at Pendleton. Centurion is the contracted medical services provider for the Indiana Department of Correction.

### B. Overall Course of Treatment

Mr. Emerson was diagnosed with MS in 2013. (Dkt. 2 at 1). Although MS is incurable, some medications can manage its symptoms, including Glatiramer (Copaxone), which is administered daily by injection. (Dkt. 37-5 at ¶ 6). Glatiramer is not on the Indiana Department of Correction ("IDOC") formulary list. *Id.* at ¶ 7. To obtain Glatiramer (or any non-formulary drug) for an IDOC inmate, a physician must complete a Formulary Exception Request ("FER"). *Id.* A FER must be approved before the drug can be filled by the prison pharmacy and provided to a patient. *Id.* FERs generally last for 180 days before the patient must be reassessed and a new FER submitted and approved. *Id.*

On April 2, 2022, while Mr. Emerson was at the Indiana State Prison, a FER for Glatiramer was approved for him to run through September 28, 2022. *Id.* at ¶ 10. Mr. Emerson had been taking Glatiramer for several years to control his symptoms. *Id.* at ¶ 6. Later in April 2022, Mr. Emerson was transferred to Pendleton. (Dkt. 2 at 1). Upon his arrival, he was seen at Pendleton by Nurse Eunice Adetoro for an intake evaluation, who noted his Glatiramer prescription. (Dkt. 37-1 at 1). On May 5, 2022 Mr. Emerson submitted a healthcare request, stating that he had not received a Glatiramer injection in two weeks, since coming to Pendleton. *Id.* at 127. Mr. Emerson was informed that Pendleton did not yet have any Glatiramer in stock but would get it "ASAP." *Id.* On May 10, Mr. Emerson received his first Glatiramer injection at Pendleton. *Id.* at 8; Dkt. 43-1 at ¶ 5. On June 9, 2022, Dr. Mershon saw Mr. Emerson for a chronic care visit. (Dkt. 37-1 at 12; Dkt. 37-5 at ¶ 10). Dr. Mershon noted that Mr. Emerson's FER for Glatiramer was good through September 28. *Id.* at ¶ 10. Dr. Mershon ordered an MRI for Mr. Emerson's head to track the progress of his MS, because he had not had a head MRI since 2017. Dkt. 37-5 at ¶ 11.

On August 1, 2022 Mr. Emerson was seen by Nurse Practitioner Vernon Osborn ("NP Osborn"). (Dkt. 37-1 at 17). At this visit, Mr. Emerson reported that the Glatiramer was no longer effective. *Id.* NP Osborn submitted a request for Mr. Emerson to evaluated by an outside neurologist. *Id.* That consultation took place on October 5, 2022, and the neurologist recommended that Mr. Emerson continue taking Glatiramer. (Dkt. 37-5 at ¶ 15). On November 9, Dr. Mershon submitted another FER for Glatiramer, which was approved and valid through May 7, 2023. *Id.* at ¶ 16.

On February 24, 2023, NP Osborn submitted a FER for Mr. Emerson to try a new MS medication, Tecfidera, which would run through August 22, 2023. (Dkt. 37-1 at 32). At an April 7, 2023 visit with Dr. Mershon, Mr. Emerson reported worsening symptoms since the medication change. (Dkt. 37-5 at ¶ 21). Dr. Mershon gave Mr. Emerson a steroid shot and advised him to follow up in a week. *Id.* On April 10, Dr. Mershon submitted a new FER for Glatiramer. *Id.* at ¶ 22. At a June 1, 2023 chronic care visit, Mr. Emerson reported feeling much better after switching back to Glatiramer. *Id.* at ¶ 24.

On September 8, 2023 NP Nudi submitted another FER for Glatiramer, which ran through April 8, 2024. (Dkt. 31-1 at ¶ 35).[1] On December 31, 2023, in response to Mr. Emerson's recent weight loss, Dr. Mershon ordered that he receive a high-protein diet for the next six months, which order was extended for another six months. *Id.* at ¶¶ 38, 45. On April 5, 2024, another FER was submitted for Glatiramer, to run through October 1, 2024. *Id.* at ¶ 41. However, there was a delay in approving this FER, which resulted in Mr. Emerson not receiving Glatiramer for a period of

---

[1] Mr. Emerson has cited and relied upon evidence submitted in connection with his preliminary injunction motion. (Dkt. 26), and the instant fact is supported by Dr. Mershon's preliminary injunction affidavit. (Dkt. 31-1). Defendants did not directly object to Mr. Emerson's reliance, but they do assert that any evidence arising after the date Mr. Emerson filed his complaint is irrelevant. The Court disagrees, as discussed below, and will consider this evidence.

time in April 2024. *Id.* at ¶ 42. Mr. Emerson has also received physical therapy treatment and advice, in part to address his MS symptoms. (Dkt. 31-1 at ¶ 40).

### C. Missed Medication Dates

At Pendleton, the Glatiramer injections are done at a nursing station, unless an inmate is unable to walk to the station, in which case a nurse will come and administer the injection at the inmate's cell. (Dkt. 37-5 at ¶ 8). When Mr. Emerson misses' doses of Glatiramer, it results in "crippling pain and extreme anxiety and deterioration of my mobility/condition." (Dkt. 2 at 1). Mr. Emerson affirms in an affidavit, dated October 11, 2024, that he did not receive his Glatiramer injections on the following dates:

- April 22-May 9, 2022
- June 11, 2022
- July 1, 2022
- July 16-21, 2022
- November 1-8, 2022
- December 17, 2022, until sometime in January 2023
- April 3-13, 2023
- November 15-16, 2023
- November 23-24, 2023
- January 17-18, 2024
- April 19-30, 2024
- July 31-August 2, 2024

(Dkt. 43-1 at ¶¶ 5-16). Mr. Emerson also states:

5

> From time to time, the nursing staff at the Pendleton Correctional Facility will neglect to give my daily Glatiramer injection for a single day; yet, whenever I have been forced to go *days and weeks at a time* without my daily Glatiramer injections, the nurses always tell me the prescription has run out and that *there is no Glatiramer in the facility*; the nurses tell me they are awaiting more Glatiramer to be made available for them to give me.

*Id.* at ¶ 19 (emphases in original).

Two of Mr. Emerson's fellow inmates, Kenneth Rackemann and Clyde Brock submitted affidavits. Mr. Rackemann affirms that "[o]n multiple occasions between June 2022 and October 2024, I have been forced to go without taking my critical medications [for hypertension and diabetes] because my prescriptions run out, and the medical staff are slow to get my prescriptions refilled." (Dkt. 43-1 at 5). Mr. Brock affirms that "[o]n multiple occasions between June 2022 and September 2024, I have been forced to go without taking my critical medications [for hypertension] because my prescriptions run out, and the medical staff are slow to get my prescriptions refilled." *Id.* at 8.

Mr. Emerson has asked the Court to take judicial notice of a lawsuit that Mr. Brock filed about the issue of frequently missed medications, *Brock v. Centurion*, No. 1:22-cv-01734-SEB-CSW (S.D. Ind.). The case was dismissed for Mr. Brock's failure to exhaust administrative remedies. *Id.* at Dkt. 44.

### D. Procedural History

Mr. Emerson filed this suit on September 15, 2023. (Dkt. 2). Although he did not expressly ask for injunctive relief, he did request "all other just and proper relief" in addition to compensatory and punitive damages. *Id.* at 3. On May 22, 2024, Mr. Emerson filed a preliminary injunction motion, alleging ongoing delays in receiving or missed administrations of Glatiramer. (Dkt. 26). Considering the high threshold for this extraordinary remedy, the Court found that Mr. Emerson

had not met his burden of proving each element by a preponderance of the evidence, and on November 15, 2024, the Court denied preliminary injunctive relief.[2] (Dkt. 48). Defendants, meanwhile, filed their summary judgment motion on September 17, 2024 (Dkt. 36), which is now ripe for ruling.

### III. DISCUSSION

#### A. Post-Complaint Evidence

Before discussing the merits, the Court addresses the fact that Mr. Emerson has relied heavily in his summary judgment response upon evidence of events occurring after the date he filed his complaint. Defendants state in a footnote in their reply brief, "Defendants will not address these additional dates as they are not relevant to the case." (Dkt. 47 at 2 n.2). Defendants do not cite any authority for this proposition, which the Court believes is inconsistent with federal pleading and practice rules. Specifically, a complaint does not have to include "all legal elements (or factors) plus facts corresponding to each." *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 800 (7th Cir. 2018). Mr. Emerson is not attempting to improperly raise an entirely new legal theory or basis of liability at the summary judgment stage; rather, he is simply presenting additional evidence in support of his original claims, which is permissible. *See id.*

Also, Defendants' suggestion that this Court should ignore any evidence arising after the date Mr. Emerson filed his complaint is directly contrary to Supreme Court precedent, namely *Farmer v. Brennan*, 511 U.S. 825 (1994), particularly because Mr. Emerson has in part sought injunctive relief in this case. Where a prisoner seeks injunctive relief to prevent a substantial risk of serious injury in violation of the Eighth Amendment, the need for an injunction must be based

---

[2] The Court's denial of preliminary injunctive relief is not conclusive as to Defendants' summary judgment motion, especially because Mr. Emerson bore the burden of showing he was entitled to injunctive relief while Defendants bear the burden of showing they are entitled to summary judgment.

on "'prison authorities' current attitudes and conduct' . . . their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). To survive summary judgment on a claim such as Mr. Emerson's, "he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . ." *Id.* at 846. On that point, "the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction." *Id.* The Court here will consider Mr. Emerson's designated evidence regarding occurrences after the date he filed his complaint. And, given Defendants' failure to address the post-complaint evidence, that evidence and Mr. Emerson's arguments about it are essentially unrefuted.

### B. Motion for Judicial Notice

Next, the Court addresses Mr. Emerson's motion for it to take judicial notice of Mr. Brock's previously filed and dismissed lawsuit against Centurion. Defendants have objected to that motion. The Court **GRANTS** the motion, (Dkt. 42), to the limited extent that the previous case may be relevant and admissible on the limited issue of whether Centurion has had previous notice of prisoners complaining about delays in receiving prescription medications. The Court recognizes statements made in the previous lawsuit are inadmissible to the extent that they cannot be used to prove the truth of such allegations. *See Daniel v. Cook County*, 833 F.3d 728, 743 (7th Cir. 2016) (holding documents from other jail-condition case were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain" but "may be admissible to show that

8

the defendants were on notice of their contents"). In any event, Mr. Brock has signed an affidavit about this lawsuit and the allegations he made in it.

### C. Deliberate Indifference – Dr. Mershon

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

There is no doubt that MS is an objectively serious condition. To avoid summary judgment in Dr. Mershon's favor, then, the record must allow a reasonable jury to conclude that Dr. Mershon acted with deliberate indifference—that is, that he "consciously disregarded a serious risk to [Mr. Emerson]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Mershon "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

9

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So, in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).
- refuses "to take instructions from a specialist." *Id.*
- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.
- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).
- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

As recounted above, Dr. Mershon took several proactive steps in addressing Mr. Emerson's MS. He ordered a new MRI for Mr. Emerson's head shortly after he arrived at Pendleton, due to the length of time since he had last had one to check the progress of his MS. After Mr. Emerson was referred to an outside neurologist to address his claim that Glatiramer was losing its effectiveness, and after the neurologist opined that Glatiramer was still the best option for Mr. Emerson, Dr. Mershon filed a new FER for Mr. Emerson shortly thereafter. And after Mr. Emerson again believed Glatiramer was not working and he tried a new medication, Dr. Mershon consulted with Mr. Emerson and again resubmitted a FER for Glatiramer when Mr. Emerson expressed dissatisfaction with the new medication. Dr. Mershon also ordered a high-protein diet for Mr. Emerson to address possible MS-related weight loss. And aside from Dr. Mershon's care, Mr. Emerson has received frequent care for his MS from other medical providers, including additional

renewals of this Glatiramer FERs and physical therapy. None of this evidence indicates that Dr. Mershon acted with deliberate indifference in treating Mr. Emerson's MS.

Mr. Emerson nonetheless asserts that Dr. Mershon was responsible for at least some of the delays in receiving Glatiramer or in some of the missed doses. In part, Mr. Emerson generically argues that Dr. Mershon "failed to ensure that Mr. Emerson's monthly supply of Glatiramer was obtained in a timely manner to prevent interruptions in Mr. Emerson's daily Glatiramer injections." (Dkt. 43 at 12). Dr. Mershon, however, avers that as a physician, he is only responsible for diagnosing illnesses and prescribing medication. (Dkt. 37-5 at ¶ 26). There is no evidence that Dr. Mershon had any direct control or supervision over the Pendleton pharmacy, or when and how nurses gave Mr. Emerson his Glatiramer injections, or when and how Centurion approved FERs after he submitted them, or when and how Centurion delivered non-formulary medications to Pendleton.

Regardless, Mr. Emerson specifically attributes the following medication delays to Dr. Mershon:

- April 22-May 9, 2022
- November 1-8, 2022
- April 3-13, 2023
- April 19-30, 2024

The first delay occurred when Mr. Emerson was transferred to Pendleton. At that time, he had an active Glatiramer FER from Indiana State Prison, but it appears Pendleton did not yet have the medication in stock. Mr. Emerson attributes this gap to Dr. Mershon, but it is unclear what Dr. Mershon could or should have done differently. Dr. Mershon does not personally ensure the delivery of medications to Pendleton by Centurion. In particular, it is unclear how or whether Dr.

11

Mershon should have had advance notice that an inmate who took Glatiramer was being transferred to Pendleton.

Regarding the November 2022 delay, there is no indication of when or how Dr. Mershon was alerted to the fact that Mr. Emerson's Glatiramer prescription had run out at the beginning of November 2022. And this slight delay occurred after Mr. Emerson had indicated the Glatiramer was no longer working. The possibility that Dr. Mershon did not more proactively oversee Mr. Emerson's medications is not evidence of deliberate indifference, as opposed to at most negligence. The notes that outside of prisons, patients must proactively request a refill of medications from their medical provider when a prescription is set to expire, either personally or by requesting a pharmacy to do so. Refills do not happen automatically.

Next, the April 2023 gap occurred during a time when Mr. Emerson was trying a new medication. After Mr. Emerson told Dr. Mershon that the new medication was not working, he quickly submitted a renewed FER for the Glatiramer. Dr. Mershon was not deliberately indifferent with respect to this gap.

Finally, Dr. Mershon has averred that the April 2024 gap was the result of a delay in the FER approval process. Mr. Emerson has submitted no evidence to prove to the contrary. In other words, this delay was not because Dr. Mershon failed to timely submit a FER, but because there was a delay by Centurion in approving it.

In sum, both with respect to Dr. Mershon's overall treatment of Mr. Emerson's MS and the gaps in Glatiramer injections that Mr. Emerson wishes to attribute to Dr. Mershon, there are no disputes of material fact as to whether Dr. Mershon was deliberately indifferent, and Dr. Mershon is entitled to judgment as a matter of law.

### D. Deliberate Indifference - Centurion

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To prevail on a claim against Centurion, Mr. Emerson must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Id.* Centurion cannot be held liable under the common-law theory of respondeat superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). Further, a "pivotal requirement" for any custom claim is a showing of widespread constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

"Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (cleaned up). Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* (cleaned up). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* (cleaned up). Under this theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id.* (cleaned up).

Centurion does not argue that Mr. Emerson's missing of Glatiramer injections does not cause him unnecessary pain and suffering, or that he missed an insufficient number of doses for them collectively to not amount to a constitutional violation. Rather, Centurion focuses upon whether there is sufficient evidence in the record of a Centurion policy, practice, or custom that causes that unnecessary pain and suffering. The Court concludes that Mr. Emerson has at this point submitted sufficient evidence from which a reasonable factfinder could conclude that Centurion has, if not an express policy, then a custom or practice of frequently and deliberately delaying prescription medication shipments to prisons.

In *Hildreth*, the Court addressed an inmate's Eighth Amendment/*Monell* claim that Wexford Health Sources had a custom of delaying prescription medications for prisoners. In that case, there were three documented instances of the inmate not receiving his prescribed thrice-daily Parkinson's medication, over the course of 19 months. *Hildreth*, 960 F.3d at 424-25. The inmate did not present any evidence that other inmates had problems with missed or delayed prescription medications. *Id.* at 425. The Court held, 2-1, that this evidence was insufficient on summary judgment to demonstrate a custom of delaying prescriptions. *Id.* at 426-27. In part, the Court heavily emphasized the fact that the plaintiff had not submitted any evidence of other inmates experiencing delayed prescriptions. *Id.* And, with only the plaintiff's experience in the record, the Court stated that although there are no "'bright-line rules' defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three." *Id.* at 427.

Here, the Court cannot say, as a matter of law, that Mr. Emerson cannot show the existence of a practice or pattern of Centurion's of being deliberately indifferent to keeping necessary medications in stock for inmates or delivering them in a timely manner. First, and not accounting

14

for two delays discussed above that might have been attributable to factors beyond Centurion's control (the November 2022 and April 2023 delays), and liberally construing the evidence favorably to Mr. Emerson, there is evidence of a total of 63 days of missed medications over an approximate 28-month period of time:

- April 22-May 9, 2022 (18 days)
- June 11, 2022
- July 1, 2022
- July 16-21, 2022 (6 days)
- December 17, 2022, until sometime in January 2023 (at least 16 days)
- November 15-16, 2023
- November 23-24, 2023
- January 17-18, 2024
- April 19-30, 2024 (12 days)
- July 31-August 2, 2024 (3 days)

This is considerably more missed dosages than the plaintiff in *Hildreth* experienced. Moreover, unlike that plaintiff, Mr. Emerson has submitted two affidavits from other Pendleton inmates who also affirm that they also experience frequent delays in receiving their prescription medications. This is enough evidence to allow a factfinder to find the existence of a custom of delaying prescription medications for prisoners.

Centurion, in part, speculates that any delays in providing medications for inmates could have been caused by a variety of factors, "including issues with a supplier or the poor work performance of a single employee within the pharmacy." (Dkt. 47 at 4). But Centurion has presented no evidence as to whether any such factors existed or exist. At this point, and with the

15

summary judgment burden on Centurion, Mr. Emerson does not have to negate the existence of all other possibilities for these delays. Centurion also faults Mr. Emerson for not being able to name a particular person with Centurion who might have been responsible for the delays. However, requiring a plaintiff to make such a showing, especially on summary judgment, would seem to defeat the purpose of *Monell* claims altogether, or at least in most situations.

Importantly, Mr. Emerson does not have to prove that Centurion *intended* to harm him or any other inmate to show that it has been deliberately indifferent. It is enough to survive summary judgment if the evidence allows a reasonable inference that Centurion knew that its prescription refill policies and procedures created a substantial risk of harm to inmates who rely on those medications to treat their serious medical conditions but ignored that risk. Deliberate indifference requires showing knowledge of a substantial risk of harm and either acting or failing to act in disregard of that risk, and that showing can be made by inference from circumstantial evidence. *See Christensen v. Weiss*, No. 24-1026, 2025 WL 2112704, at *5 (7th Cir. July 29, 2025). There is enough circumstantial evidence here to proceed on Mr. Emerson's *Monell* claims against Centurion.

## IV. CONCLUSION

For the reasons explained in this Order, Defendants' Motion for Summary Judgment, Dkt. [36] is **GRANTED in part** and **DENIED in part.** Summary judgment is **granted** as to Dr. Mershon and **denied** as to Centurion. The **clerk is directed** to terminate Dr. Mershon as a defendant on the docket.

Mr. Emerson's motion for judicial notice is **GRANTED** to the limited extent discussed above. Dkt. [42].

The Court prefers that Mr. Emerson be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Emerson a motion for assistance recruiting counsel with his copy of this Order. Mr. Emerson has **through September 8, 2025**, to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed *pro se*. Once the motion has been ruled on and counsel has been recruited, the Magistrate Judge is asked to schedule a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date: 8/22/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

JERRY EMERSON
146640
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Magistrate Judge Barr's Chambers